**Colleen Mary ROHAN, ex rel. Oscar GATES, Petitioner–Appellant,**

v.

**Jeanne WOODFORD, Warden, Respondent–Appellee.**

No. 01–99016.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 10, 2002.

Filed June 25, 2003.

William L. Osterhoudt, San Francisco, California, argued for the appellant. Tim Brosnan joined him on the briefs.

John H. Deist, Deputy Attorney General, San Francisco, California, argued for the appellee. Bill Lockyer, Robert R. Anderson, Ronald A. Bass and Dane R. Gillette joined him on the brief.

Before KOZINSKI and KLEINFELD, Circuit Judges, and KARLTON,* District Judge.

## OPINION

KOZINSKI, Circuit Judge:

We decide whether a district court must stay capital habeas proceedings during a petitioner's incompetence.

### I

Oscar Gates was sentenced to death for murdering Lonnie Stevenson in 1979. Gates belonged to a forgery ring run by the Stevenson family, and became embroiled in a dispute over his cut of the proceeds during which a Stevenson family member shot him in the leg. Gates then went to the Stevensons' house with a gun and met two family members, Lonnie and Maurice, in the yard. Gates killed Lonnie and wounded Maurice. Maurice claims Gates ordered them to hand over their

---

* The Honorable Lawrence K. Karlton, Senior United States District Judge for the Eastern District of California, sitting by designation.

jewelry and then shot them both. Gates claims he fired only after another family member showed up wielding a gun.

The State charged Gates with murder, robbery and other offenses. The jury convicted on all counts and found the special circumstance of murder in connection with a robbery, making Gates eligible for the death penalty. During the penalty phase, the State introduced evidence of Gates's prior convictions for robbery, rape and kidnaping. It also presented evidence of a prior assault and robbery of two women that had resulted in one's death, a crime for which Gates was later convicted. The defense responded with evidence of Gates's upbringing, alleging that he had been a victim of police harassment and racism. Gates's neighbors testified he was a "good-natured person," and a clinical psychologist characterized him as well-adjusted. After considering this evidence, the jury sentenced Gates to death. The California Supreme Court affirmed the conviction and sentence on direct review in 1987. *People v. Gates*, 43 Cal.3d 1168, 240 Cal. Rptr. 666, 743 P.2d 301 (1987).

Since his conviction, Gates has been acting uncooperatively and irrationally. He has filed an extraordinary number of pro se habeas petitions in various courts—more than 120 by 1993 alone, some hundreds of pages long. The petitions are rambling and make outlandish claims. They revolve primarily around Gates's theory that he is a beneficiary of the Howard Hughes trust fund, and that state officials and his appointed defense counsel are conspiring to "assassinate" him in order to deny him his inheritance. The petitions often lapse into even more fanciful claims—that prison medical staff are trying to poison him with radioactive cobalt, or that Howard Hughes told him how to cure AIDS with yellow chili peppers. Gates's counsel believe he is delusional and

suffers from a psychological condition known as "hypergraphia." The State, however, suspects Gates is fully capable of acting rationally and is malingering to avoid the death penalty.

Gates's counsel sought habeas relief in state and federal court. They believe his conviction and death sentence violated the Constitution in several respects, including: (1) Gates was incompetent to stand trial, and his trial counsel were ineffective for failing to seek a competency hearing; (2) Gates's speedy trial rights were violated, and evidence was lost as a result; (3) the State failed to disclose bargains it reached with prosecution witnesses; (4) the jury instructions misstated the murder/robbery aggravating circumstance; (5) Gates's lawyers were ineffective for presenting inadequate mitigating evidence of his upbringing; (6) the penalty-phase jury instructions misstated the procedure for considering mitigating circumstances; and (7) California's death penalty is unconstitutional because it does not sufficiently narrow the class of death-eligible defendants. Counsel also argue that Gates is currently incompetent and that further habeas proceedings must be stayed until he can communicate rationally. They say their ability to pursue many of Gates's claims is impaired by their inability to converse with him, and that proceeding while Gates is incompetent would undermine his constitutional due process rights and his statutory right to capital habeas counsel under 21 U.S.C. § 848(q)(4)(B).

Gates exhausted his claims before the state courts, including a claim that he was incompetent to pursue state collateral review. No state competency hearing was held. His competence was then litigated in federal court for the next several years. He was transferred to the California Department of Mental Health, where he was examined over two months by a state psy-

chiatrist and a psychiatrist retained by Gates's counsel. Both concluded that Gates is not malingering, and truly does have a mental impairment. The state psychiatrist reported that Gates "suffer[s] from a mental disease or defect" that "markedly interferes with a *rational* understanding" of the proceedings, and that he is "quite unable to make rational decisions." In response to the question whether Gates's condition "[r]ender[s] him unable, as opposed to unwilling, to assist his counselor in the preparation of his petition for writ of habeas corpus," the psychiatrist wrote, "His unwillingness stems from his paranoid lack of trust and certainty he is being persecuted. His attorneys have attested to his inability to cooperate."

Gates's own expert reached similar conclusions. In response to the question whether Gates had "the capacity to appreciate his position and make rational choices with regard to the current proceedings in this Court," he answered "definitely in the negative." "He is unable to cooperate with his attorneys and he is unable to be rational about the Court .... He is unable to make rational decisions with respect to the proceedings in the Court .... I do not think he can cooperate with any attorney."

The district court held a competency hearing in which it reviewed the two experts' findings and interviewed Gates in camera. It concluded:

Gates' mental condition would seriously impede his attorneys from protecting his rights.... Mr. Gates [is] presently incompetent, in that he presently suffers from a mental disorder that may substantially affect his capacity to cooperate with counsel and proceed with his petition in this court. This disorder denies Mr. Gates the capacity to appreciate his

position and to make rational choices with respect to these habeas proceedings.[1]

After making these determinations, however, the court did not stay further proceedings as requested. Instead, it appointed Colleen Rohan, an attorney, to pursue Gates's petition as "next friend" on his behalf.

Rohan soon reported that she, too, was unable to pursue Gates's habeas claims effectively because she could not communicate rationally with him. She renewed the request to stay further proceedings. The State took the position that adjudication of Gates's petition should proceed despite his incompetence. The district court told Rohan to file a brief under seal identifying the claims requiring Gates's assistance and describing the information sought. Rohan submitted the sealed brief. The district court reviewed it and then denied the request to stay proceedings.

The district court held that neither due process nor the federal habeas statutes required a stay, because Rohan's appointment as next friend adequately protected Gates's interests. It acknowledged that due process requires a criminal defendant to be competent to stand trial. In its view, however, that requirement did not apply to habeas proceedings, which are a mere "secondary and limited" component of the criminal justice process, *Barefoot v. Estelle*, 463 U.S. 880, 887, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983). The court observed that federal statutory law and Supreme Court precedent both assume that next friends can pursue habeas claims on an incompetent prisoner's behalf. *See* 28 U.S.C. § 2242 ("Application for a writ of habeas corpus shall be in writing signed

---

1. The district court's order is sealed. We quote from it to the extent necessary to render our discussion intelligible.

and verified by the person for whose relief it is intended *or by someone acting in his behalf.*" (emphasis added)); *Whitmore v. Arkansas,* 495 U.S. 149, 162, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990) (noting that next friend standing "has long been an accepted basis for jurisdiction").

The court acknowledged that, in some cases, a competent petitioner could "provide information that might strengthen some of the claims in the petition or give rise to other claims." But it held that this was not such a case: "Without revealing the content of [the sealed brief], it can be described as being fairly general. Accordingly, at the present time, and on the present record, the Court finds that a stay of these proceedings is not warranted."

Acknowledging that the issue was close and that judicial economy favored immediate resolution, the court certified its ruling for interlocutory review under 28 U.S.C. § 1292(b), and we accepted jurisdiction. We must assume for purposes of this appeal that Gates's incompetence is bona fide; we address only its consequences.[2]

## II

1. Our constitutional and statutory interpretations are shaped by common law tradition. We therefore begin, as other courts have before us, by reviewing the pedigree of the right that Rohan invokes on Gates's behalf.

The right to competence was firmly established at common law. Sir Matthew Hale, Lord Chief Justice of the King's Bench, noted in his *Pleas of the Crown* that the common law prohibited trial and execution of incompetents:

[I]f [a] person after his plea, and before his trial, become of non sane memory, he shall not be tried; or, if after his trial he become of non sane memory, he shall not receive judgment; or, if after judgment he become of non sane memory, his execution shall be spared; for were he of sound memory, he might allege somewhat in stay of judgment or execution.

1 Sir Matthew Hale, *The History of the Pleas of the Crown* 35 (Prof'l Books Ltd. 1971) (1736) (pre–1676 manuscript). Sir John Hawles, Solicitor–General under William III, articulated a similar standard:

[N]othing is more certain law, than that a person who falls mad after a crime supposed to be committed, shall not be tried for it; and if he falls mad after judgment he shall not be executed .... [T]he true reason of the law I think to be this, a person of "non sana memoria," and a lunatick during his lunacy, is by an act of God ... disabled to make his just defence. There may be circumstances lying in his private knowledge, which would prove his innocency, of which he can have no advantage, because not known to the persons who shall take upon them his defence....

Sir John Hawles, *Remarks on the Trial of Mr. Charles Bateman* (1719), *reprinted in* 11 State Trials 473, 476 (T.B. Howell ed., 1811). And Blackstone repeated this standard in his *Commentaries:*

[I]f a man in his sound memory commits a capital offence, and before arraignment for it, he becomes mad, he ought not to be arraigned for it; because he is not able to plead to it with that advice

2. There is some ambiguity in the district court's findings. It found that Gates "presently suffers from a mental disorder that *may* substantially affect his capacity to cooperate with counsel and proceed with his petition in this court." (Emphasis added.) The State, however, does not dispute the district court's determination of incompetence in this appeal. We therefore proceed on the assumption that Gates is incompetent—in other words, that he is unable to communicate rationally with counsel.

and caution that he ought. And if, after he has pleaded, the prisoner becomes mad, he shall not be tried; for how can he make his defence? If, after he be tried and found guilty, he loses his senses before judgment, judgment shall not be pronounced; and if, after judgment, he becomes of nonsane memory, execution shall be stayed: for peradventure, says the humanity of the English law, had the prisoner been of sound memory, he might have alleged something in stay of judgment or execution.

4 William Blackstone, *Commentaries* \*24–25 (1769); *see also id.* at \*389 ("[T]he law knows not but he might have offered some reason, if in his senses, to have stayed [the] proceedings.").

Hale, Hawles and Blackstone all tied competence to capacity for rational communication. Competence allowed a defendant to "make his defence" and a condemned to "allege[ ] something in stay of judgment or execution." *Id.* at \*24–25; *cf.* 1 Hale at 35. It precluded "circumstances lying in [the condemned's] private knowledge, which would prove his innocency, of which he can have no advantage, because not known to the persons who shall take upon them his defence." Hawles at 476. Competence was more than just the ability to understand what was going on—it was the capacity to communicate exonerating information to others.

The right to competence, moreover, did not expire with the return of the jury's verdict. It persisted through entry of judgment and to execution. *See* 4 Blackstone at \*24–25; 1 Hale at 35. Then, as now, trial was the pivotal truth-seeking event, but the right to competence was so fundamental that it persisted beyond trial, for the prisoner may yet "allege[ ] something in stay of judgment or execution." 4 Blackstone at \*24–25.

Next friends and guardians who could act on an incompetent's behalf were familiar at common law. *See* 1 *id.* at \*448–54. But the authorities give no hint that the Crown could avoid the competence requirement by appointing a next friend to "allege[ ] something in stay of judgment or execution" on an incompetent's behalf. Quite the contrary; the rule applied even when others stood ready to "take upon them his defence." *See* Hawles at 476.

■ Though well-settled at common law, the right to competence has met with a mixed constitutional reception. The Supreme Court has recognized a due process right to competence during the trial itself. *See Cooper v. Oklahoma*, 517 U.S. 348, 354, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996); *Medina v. California*, 505 U.S. 437, 453, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992); *Drope v. Missouri*, 420 U.S. 162, 171, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975); *Pate v. Robinson*, 383 U.S. 375, 378, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966); *cf. Spain v. Rushen*, 883 F.2d 712, 722, 728 (9th Cir.1989) (finding a constitutional violation where severe and prolonged shackling impaired the defendant's mental faculties and ability to communicate with counsel). A criminal defendant must have " 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding ... [and] a rational as well as factual understanding of the proceedings against him.' " *Cooper*, 517 U.S. at 354, 116 S.Ct. 1373 (quoting *Dusky v. United States*, 362 U.S. 402, 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (per curiam)). The rationale for the requirement has shifted somewhat: Capacity for rational communication once mattered because it meant the ability to defend oneself, *see Faretta v. California*, 422 U.S. 806, 823–26, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975); John H. Langbein, *The Criminal Trial Before the Lawyers*, 45 U. Chi.

L.Rev. 263 (1978), while it now means the ability to assist counsel in one's defense, *see Cooper*, 517 U.S. at 354, 116 S.Ct. 1373. But whatever the rationale for the requirement, capacity to communicate remains a cornerstone of due process at trial.

The right to competence *after* trial, now addressed almost exclusively in the context of competence to be executed, has taken a different course. States have long barred execution of the insane, but the constitutional scope of that right remains unsettled. In early decisions, the Court held that due process did not require states to assign a condemned's insanity claim to a jury, *see Nobles v. Georgia*, 168 U.S. 398, 18 S.Ct. 87, 42 L.Ed. 515 (1897), or even to a judicial officer, *see Solesbee v. Balkcom*, 339 U.S. 9, 70 S.Ct. 457, 94 L.Ed. 604 (1950). Those decisions addressed the manner of ascertaining competence rather than whether it was required. In *Solesbee*, however, Justice Frankfurter reached the question in a separate opinion, writing:

> [T]he practical considerations are not less relevant today than they were when urged by Sir John Hawles and Hale and Hawkins and Blackstone in writings which nurtured so many founders of the Republic. If a man has gone insane, is he still himself? Is he still the man who was convicted? In any event "were he of sound memory, he might allege somewhat" to save himself from doom. It is not an idle fancy that one under sentence of death ought not, by becoming *non compos*, be denied the means to "allege somewhat" that might free him. Such an opportunity may save life, as the last minute applications to this Court from time to time and not always without success amply attest.

*Id.* at 19–20, 70 S.Ct. 457 (Frankfurter, J., dissenting); *see also id.* at 20 n. 3, 70 S.Ct. 457 (quoting state decisions requiring "intelligence requisite to convey [exonerating] information to [one's] attorneys or the court").

The Court confronted the question directly in *Ford v. Wainwright*, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986), albeit through the Eighth Amendment's ban on cruel and unusual punishment rather than the Due Process Clause. A plurality concluded that the Eighth Amendment bars execution of the insane without settling on a definition of the term. *Id.* at 406–10, 106 S.Ct. 2595. Justice Powell wrote separately. He noted that Hale and Blackstone had tied competence to be executed to capacity for rational communication but, in his view, this justification had "slight merit today" in light of the "far more extensive review of convictions and sentences" available through direct appeal and state and federal collateral review. *Id.* at 419–20, 106 S.Ct. 2595 (Powell, J., concurring). "It is ... unlikely indeed that a defendant today could go to his death with knowledge of undiscovered trial error that might set him free." *Id.* at 420, 106 S.Ct. 2595. He thus found "no sound basis for constitutionalizing the broader definition of insanity, with its requirement that the defendant be able to assist in his own defense," *id.* at 422 n. 3, 106 S.Ct. 2595, and adopted instead a narrower definition that barred execution "only of those who are unaware of the punishment they are about to suffer and why they are to suffer it," *id.* at 422, 106 S.Ct. 2595. Although Justice Powell spoke only for himself, both the Supreme Court and our own court have since referred to his standard with apparent approval, *see Penry v. Lynaugh*, 492 U.S. 302, 333, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989); *Massie ex rel. Kroll v. Woodford*, 244 F.3d 1192, 1195 n. 1 (9th Cir.2001) (per curiam), and other circuits have explicitly adopted it, *see, e.g.,*

*Rector v. Clark,* 923 F.2d 570, 572–73 (8th Cir.1991).[3]

2. We confront a question that falls somewhere between these two lines of authority: not competence to stand trial or competence to be executed, but competence to pursue collateral review of a state conviction in federal court. Must a district court stay habeas proceedings when a petitioner cannot assist counsel because he is incapable of rational communication?

This is an issue the Supreme Court precedents do not conclusively resolve. The constitutional requirement of competence to stand trial certainly does not imply a coordinate requirement on collateral review. As the State reminds us, habeas is a "secondary and limited" component of the criminal justice process, *Barefoot v. Estelle,* 463 U.S. 880, 887, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983), where many of the defendant's rights no longer attach. There is, for example, no constitutional right to counsel on habeas, *Murray v. Giarratano,* 492 U.S. 1, 10, 109 S.Ct. 2765, 106 L.Ed.2d 1 (1989) (plurality opinion); *Pennsylvania v. Finley,* 481 U.S. 551, 557, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987),

effective or otherwise, *see Bonin v. Vasquez,* 999 F.2d 425, 429–30 (9th Cir.1993). And, subject to possible Suspension Clause constraints, *see Felker v. Turpin,* 518 U.S. 651, 663–64, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996), there is no due process right to collateral review at all, *see United States v. MacCollom,* 426 U.S. 317, 323, 96 S.Ct. 2086, 48 L.Ed.2d 666 (1976) (plurality opinion).

On the other hand, Justice Powell's *Ford* opinion does not *preclude* such a requirement. Competence to pursue collateral relief on a first federal petition was not at issue there; Ford did not claim incompetence until *after* his state and federal petitions were denied—a fact relied on by both Justice Powell and the four Justices in dissent. *See Ford,* 477 U.S. at 420 n. 1, 106 S.Ct. 2595 (Powell, J., concurring) ("Only after all of these challenges had been resolved against him did petitioner challenge his impending execution on the ground of insanity."); *id.* at 434–35, 106 S.Ct. 2595 (Rehnquist, J., dissenting) (characterizing the case as a "post-collateral-attack challenge to a State's effort to carry out a lawfully imposed sentence").[4]

---

3. Some jurisdictions, however, do incorporate the common law requirement of capacity for rational communication. *See, e.g.,* Miss.Code Ann. § 99–19–57(2)(b); *Fisher v. State,* 845 P.2d 1272, 1276 n. 3 (Okla.Crim.App.1992); *In re Smith,* 25 N.M. 48, 176 P. 819, 823–24 (1918); *see also ABA Criminal Justice Mental Health Standards* std. 7–5.6 & cmt., at 290–93 & n. 7 (1989).

The Supreme Court has also recently held that execution of the mentally retarded violates the Eighth Amendment, relying on, inter alia, the fact that "[m]entally retarded defendants may be less able to· give meaningful assistance to their counsel." *Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 2252, 153 L.Ed.2d 335 (2002); *see also id.* at 2267 (Scalia, J., dissenting) (arguing that the issue should be analyzed under the Due Process Clause). Incompetence and mental retardation are overlapping but distinct categories.

Many retarded individuals are still competent to stand trial. *See id.* at 2250 (majority opinion). A mental defect, however, must manifest itself by age 18 in order to satisfy the clinical (and apparently constitutional) definition of retardation. *Id.*

4. Ford apparently did not even begin to lose competence until after his first federal petition was filed. The decision reports that Ford first "began to manifest gradual changes in behavior" in "early 1982." *Ford,* 477 U.S. at 402, 106 S.Ct. 2595. Ford's federal petition appears to have been filed at the end of 1981 or very early in 1982. *Compare Ford v. State,* 407 So.2d 907 (Fla.1981) (December 4, 1981, denial of state postconviction relief), *with Ford v. Strickland,* 676 F.2d 434 (11th Cir. 1982) (April 15, 1982, panel opinion affirming district court's denial of federal habeas relief), *vacated,* 696 F.2d 804 (11th Cir.1983) (en banc). In any case, the important point is

Indeed, Justice Powell specifically relied on the efficacy of collateral review among the reasons to discard the common law rational communication requirement at execution. *See id.* at 420 & n. 1, 106 S.Ct. 2595 (Powell, J., concurring). When collateral review is compromised by the petitioner's incompetence, however, this justification fails. *Cf. Rector v. Bryant,* 501 U.S. 1239, 1242 n. 2, 111 S.Ct. 2872, 115 L.Ed.2d 1038 (1991) (Marshall, J., dissenting from denial of certiorari).[5] If anything, *Ford* reinforces the importance of competence to pursue collateral review because it removes common law safeguards at later stages of the process.

Any attempt to appreciate the relevance of the common law rational communication requirement today must also come to grips with the fact that collateral review—and judicial oversight in general—have subsumed many of the functions formerly performed by executive clemency at the time of execution:

> For centuries governors commuted death sentences in significant numbers. That pattern continued for the first two-thirds of the twentieth century. Florida commuted nearly a quarter of its death sentences between 1924 and 1966; North Carolina commuted more than a third between 1909 and 1954. Those figures dropped close to zero under the new sentencing schemes. In 1987, for example, there were 299 death sentences in the United States and only 5 commutations; in 1988 there were 296 death sentences and only 4 commutations. Clemency was once a regular part of the capital sentencing process, but once the process was constitutionalized clemency became a freak occurrence.

... [M]any of the kinds of cases that had once been suitable for clemency were now being handled by the courts instead. Judges, not governors, now decided whether trials had been conducted fairly, so when considering applications for clemency governors tended to defer to the courts that resolved the defendant's constitutional claims.... Where the sentence had been affirmed as constitutional at all stages of judicial review, ... the assumption within governors' offices tended to be that the sentence ought not to be disturbed, an assumption very different from the one that had prevailed for the preceding several centuries, when the executive branch was supposed to exercise its independent judgment as to the propriety of an execution.

Stuart Banner, *The Death Penalty: An American History* 291–92 (2002) (footnote omitted). *But see* Jodi Wilgoren, *Citing Issue of Fairness, Governor Clears Out Death Row in Illinois,* N.Y. Times, Jan. 12, 2003, § 1, at 1. The ability to "allege[ ] something in stay of judgment or execution," 4 Blackstone at *24–25, now has far more practical significance in postconviction proceedings than at the moment of execution. From that perspective, *Ford* can be seen not as removing common law protections, but merely as refocusing them where they now matter.

One might counter that prisoners unhappy with the habeas process can simply decline to invoke it. Collateral review is, perhaps, "voluntary" in a sense that trial and execution are not; the government does not compel anyone to pursue relief.

that Ford did not claim he was incompetent until later.

5. Justice Marshall gave this as a reason to reject Justice Powell's position, but we see it

as entirely consistent. *Ford* addressed competence to be executed, not competence to pursue collateral review.

But "one may be a voluntary party only because there is no other means of protecting legal rights." *Bittaker v. Woodford*, 331 F.3d 715, No. 02–99000, slip op. 7635, 7652 (9th Cir. June 6, 2003) (en banc) (internal quotation marks omitted). No one would defend an inadequate trial by pointing out that the unhappy defendant could have pled guilty if he didn't like it. The price of foregoing habeas review is leaving potential constitutional claims unredressed.

One might also suggest that a petitioner suffers no prejudice if forced to proceed while incompetent because he can always raise claims in a successive petition once he regains competence. This argument, too, falls short. Federal law imposes strict limits on successive petitions. 28 U.S.C. § 2244 provides:

> (b)(1) A claim presented in a second or successive habeas corpus application under section 2254 that was presented in a prior application shall be dismissed.

> (2) A claim presented in a second or successive habeas corpus application under section 2254 that was not presented in a prior application shall be dismissed unless—

>> . . . .

> (B)(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and

> (ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would

have found the applicant guilty of the underlying offense.

28 U.S.C. § 2244. A prisoner who cannot convey relevant information to his counsel for his first petition thus faces formidable obstacles if he later regains competence and tries to file a second. The information may tend to prove a claim counsel already presented unsuccessfully. In that case, subsection (b)(1) categorically bars relief: It applies whenever "the basic thrust or gravamen of the legal claim is the same," even if the petitioner offers "new factual grounds in support." *Babbitt v. Woodford*, 177 F.3d 744, 746 (9th Cir.1999) (internal quotation marks omitted). If the information relates to an entirely new claim, the petitioner may not be totally out of luck, but he must still overcome subsection (b)(2)(B)(ii)'s enhanced "clear and convincing evidence" standard.

More importantly, successive petitions are not particularly helpful to a prisoner executed before he ever regains competence. Under Justice Powell's *Ford* standard, the state can carry out a death sentence so long as the prisoner understands the nature and purpose of the punishment, even if he lacks capacity to communicate exonerating information. The Attorney General has made quite clear in this case that the State intends to do exactly that: Gates will be executed whether or not he ever regains the ability to communicate rationally. Compelling a prisoner to pursue federal review while incompetent may thus prevent him from *ever* being able to bring claims based on his private knowledge.[6]

■ [1] 3. Congress has not explicitly required competence in federal habeas

---

**6.** This issue could be addressed in a challenge to the execution itself once that claim becomes ripe. *See Martinez–Villareal v. Stewart*, 118 F.3d 628, 630 (9th Cir.1997), *aff'd*, 523 U.S. 637, 118 S.Ct. 1618, 140 L.Ed.2d 849 (1998). But where the gravamen of a prospective competence-to-be-executed claim is the failure to have afforded meaningful habeas review, the issue is also appropriately considered during the habeas proceedings.

proceedings, but the common law tradition underlying the right to competence and its great practical significance in this context inform our interpretation of the statutes Congress has enacted. *Cf. Beck v. Prupis*, 529 U.S. 494, 500–01, 120 S.Ct. 1608, 146 L.Ed.2d 561 (2000). In capital cases, prisoners challenging their convictions or sentences in federal court have a right to assistance of counsel. *See* 21 U.S.C. § 848(q)(4)(B). This prescription reflects Congress's belief that "federal habeas corpus has a particularly important role to play in promoting fundamental fairness in the imposition of the death penalty," *McFarland v. Scott*, 512 U.S. 849, 859, 114 S.Ct. 2568, 129 L.Ed.2d 666 (1994), and that meaningful assistance of counsel is essential to secure federal constitutional rights. Counsel's assistance, however, depends in substantial measure on the petitioner's ability to communicate with him. And if meaningful assistance of counsel is essential to the fair administration of the death penalty and capacity for rational communication is essential to meaningful assistance of counsel, it follows that Congress's mandate cannot be faithfully enforced unless courts ensure that a petitioner is competent.

Implying a right to competence from a right to counsel breaks no new ground. It is an inference courts have drawn in many different contexts. The Supreme Court, for example, often grounds the constitutional competence-to-stand-trial requirement in the Sixth Amendment right to counsel. *See Cooper*, 517 U.S. at 354, 116 S.Ct. 1373 (" 'Competence to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial, including the right to effective assistance of counsel . . . .' " (quoting *Riggins v. Nevada*, 504 U.S. 127, 139–40, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992) (Kennedy, J., concurring in the judgment))). Likewise, both federal and state courts—in

decisions we analyze at greater length below—have implied a right to competence from statutory rights to counsel. *See Calderon v. U.S. Dist. Court (Kelly V)*, 163 F.3d 530, 541 (9th Cir.1998) (en banc) ("[The] statutory right to counsel . . . contemplates effective communication between lawyer and client."); *Carter v. State*, 706 So.2d 873, 875 (Fla.1998) ("Unless a death-row inmate is able to assist counsel by relaying [pertinent] information, the right to collateral counsel . . . would be practically meaningless."); *People v. Owens*, 139 Ill.2d 351, 151 Ill.Dec. 522, 564 N.E.2d 1184, 1189–90 (1990). *But see Ex parte Mines*, 26 S.W.3d 910, 911–12 (Tex. Crim.App.2000).

Our construction also respects the principle that statutes should be interpreted to avoid substantial constitutional questions. *See Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988). Although Rohan cites no case squarely recognizing her due process claim, it is far from insubstantial. Having provided for collateral review of state sentences, Congress must supply procedures that comport with due process. *Bonin*, 999 F.2d at 429; *cf. Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 289, 118 S.Ct. 1244, 140 L.Ed.2d 387 (1998) (narrowest-grounds opinion of O'Connor, J.) (holding that the Due Process Clause applies even to clemency proceedings). The firmly entrenched common law right to competence persisting beyond trial is a strong indicator of a constitutional due process right. *Cf. Cooper*, 517 U.S. at 356, 116 S.Ct. 1373. To be sure, Blackstone never singled out a right to competence in *habeas* proceedings. That's not surprising; the English Habeas Corpus Act specifically excluded challenges to convictions by a court of competent jurisdiction. *See Ex parte Watkins*, 28 U.S. (3 Pet.) 193,

202–03, 7 L.Ed. 650 (1830). But Blackstone's exhaustive recitation of the stages at which the right attached—arraignment, trial, judgment and execution—might reasonably be read to suggest a continuing right, one that attaches to all significant phases of the criminal justice process, whatever they may happen to be. This reading is particularly compelling when new stages of that process are invoked to justify stripping common law protections from others to which the right indisputably *did* attach.

Rohan's due process claim is debatable, but it raises constitutional questions substantial enough that we should avoid them if possible. By reasonably construing 21 U.S.C. § 848(q)(4)(B) to incorporate a statutory right to competence, we leave them for another day.

■ 4. Our own case law all but dictates the result here. In *Calderon v. U.S. District Court (Kelly V)*, 163 F.3d 530 (9th Cir.1998) (en banc), *overruled in unrelated part by Woodford v. Garceau*, — U.S. ——, 123 S.Ct. 1398, 155 L.Ed.2d 363 (2003), we held that a prisoner's incompetence is grounds for equitably tolling AEDPA's one-year statute of limitations for filing habeas petitions:

> Kelly's alleged mental incompetency also justifies equitable tolling, at least until a reasonable period of time has elapsed after the district court makes a competency determination. The record discloses that Kelly has been having serious mental problems for many years. In fact, the State agreed that a hearing was necessary to determine his present competency. Under 21 U.S.C. § 848(q)(4)(B), Kelly has a statutory right to counsel in his federal habeas proceeding. That right contemplates effective communication between lawyer and client. A putative habeas petitioner's mental incompetency—a condition

that is, obviously, an extraordinary circumstance beyond the prisoner's control—renders the petitioner unable to assist his attorney in the preparation of a habeas petition. Such a condition could eviscerate the statutory right to counsel. Where, as here, there is a threshold showing of mental incompetency, a sufficient showing has been made for equitably tolling the statute of limitations, and we reject *Kelly III's* holding to the contrary. When a putative habeas petitioner's mental competency is at issue, and the record discloses a genuine basis for concern, it is appropriate to toll the AEDPA's time bar until a reasonable period after the district court makes a competency determination.

*Kelly V*, 163 F.3d at 541 (citations omitted).

The district court thought *Kelly V* inapplicable because it addressed equitable tolling rather than a stay. But we are bound by *Kelly V's* rationale for decision as well as its specific result. *See, e.g., Omohundro v. United States*, 300 F.3d 1065 (9th Cir.2002) (reevaluating prior circuit precedent in light of the reasoning of an intervening decision from a higher authority). *Kelly V* held that a prisoner's incompetence justifies equitable tolling because it could "eviscerate the statutory right to counsel." 163 F.3d at 541. If a petitioner's statutory rights depend on his ability to communicate rationally, compelling him to pursue relief while incompetent is no less an infringement than dismissing his late petition. Either way, his statutory right to counsel is denied.

That Gates is represented by a next friend does not distinguish *Kelly V*. Kelly was also represented by a next friend at all relevant times. *See Calderon v. U.S. Dist. Court (Kelly III)*, 127 F.3d 782, 783, 786 (9th Cir.1997). If appointment of a

next friend did not start Kelly's AEDPA clock running, it is no basis for denying Rohan's claim.

We rejected claims similar to Rohan's in two decisions preceding *Kelly V. See Kelly III*, 127 F.3d at 786–87; *Wade v. Calderon*, 29 F.3d 1312, 1326 n. 11 (9th Cir.1994). These decisions, however, do not survive *Kelly V.* A case may be undermined by intervening en banc or Supreme Court authority even though the issues are not identical, so long as the intervening decision has undercut the reasoning behind the prior precedent. *See Omohundro*, 300 F.3d at 1067. *Kelly V*'s holding that incompetence "eviscerate[s] the statutory right to counsel" is not compatible with our prior holdings that proceedings need not be stayed despite it.

We see no principled way to avoid applying *Kelly V*'s rationale to this case. That decision all but compels our holding that the district court's failure to stay proceedings violated Gates's statutory rights.

5. What little Supreme Court authority exists on this point also supports our conclusion. In *Rees v. Peyton (Rees I )*, 384 U.S. 312, 86 S.Ct. 1505, 16 L.Ed.2d 583 (1966) (per curiam), the Court ordered a competency determination after a habeas petitioner sought to withdraw his petition for certiorari. *Id.* at 314, 86 S.Ct. 1505. In a subsequent summary order, the Court stated: "This case is held without action on the petition for certiorari until further order of the Court." 386 U.S. 989, 87 S.Ct. 1310, 18 L.Ed.2d 333 (1967) (*Rees II* ). The text of this order is not illumi-

nating, but the case's unpublished record explains the Court's actions.[7]

Following *Rees I*, the district court determined that Rees was incompetent. *See* Report on Petitioner's Mental Competence at 1–2, *Rees v. Peyton*, No. 2970–M (E.D.Va. Jan.11, 1967). Rees's counsel then asked the Court to grant certiorari but stay further proceedings, arguing that, because of his incompetence, Rees was "not in a mental condition to understand the significance of what is being done and to speak in opposition," or to make decisions regarding further pursuit of relief. *See* Memorandum Re Proper Procedure Following Judicial Finding of Petitioner's Mental Incompetence at 3–6, *Rees v. Peyton*, Misc. No. 9 (U.S. Feb. 16, 1967). The State responded that the Court should either grant certiorari and determine the petition or deny certiorari and leave Rees to claim insanity at the time of execution, but that "under no circumstances should this matter be further stayed." *See* State's Memorandum at 3, *Rees v. Peyton*, Misc. No. 9 (U.S. Mar. 14, 1967). The Court's stay evidently constitutes a rejection of the State's position.[8]

Although the rationale implicit in *Rees II* may not be binding precedent, it is nonetheless persuasive. We obviously presume that the Supreme Court follows the law even when acting through summary orders rather than reasoned opinions. The record in *Rees II* shows that incompetence is grounds for staying habeas proceedings.[9]

---

7. Rohan's motion for judicial notice of these documents is GRANTED. Fed.R.Evid. 201; *United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir.1992).

8. Rees's petition was dismissed many years later. *See Rees v. Superintendent of Va. State Penitentiary*, 516 U.S. 802, 116 S.Ct. 271, 133 L.Ed.2d 10 (1995). The grounds for dismissal

are not stated, but Gates's counsel informs us that Rees had died.

9. Rohan also relies on *Anderson v. Kentucky*, 376 U.S. 940, 84 S.Ct. 795, 11 L.Ed.2d 766 (1964), *cert. dismissed as moot*, 515 U.S. 1155 (1995), another Supreme Court summary order staying further proceedings. That order indicates, however, that the parties agreed to it.

The State relies on *Whitmore v. Arkansas,* 495 U.S. 149, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990), but that case is not on point. *Whitmore* involved a purported next friend's attempt to file a habeas petition on behalf of a *competent* prisoner. The Court noted that next friend standing has "long been an accepted basis for jurisdiction" in habeas proceedings, *id.* at 162, 110 S.Ct. 1717, but held that it could only be invoked if the prisoner was incompetent, *id.* at 165, 110 S.Ct. 1717.

*Whitmore* stands for the point that a next friend *may* pursue habeas relief on an incompetent prisoner's behalf—a principle evident from the text of the habeas statute itself, *see* 28 U.S.C. § 2242 ("Application for a writ of habeas corpus shall be in writing signed and verified by the person for whose relief it is intended *or by someone acting in his behalf.*" (emphasis added)). When grounds for relief are apparent even without the prisoner's assistance, a next friend could conclude that the prisoner's best interests would be served by pursuing relief notwithstanding his incompetence. But it does not follow that, if the next friend determines that the incompetent's best interests would *not* be served by pursuing relief, the state may nonetheless compel him to do so. "Next friends," as the name suggests, are a benefit extended to incompetents to act in their best interests and on their behalf. *See Whitmore,* 495 U.S. at 162, 110 S.Ct. 1717. That a next friend *may* pursue relief does not imply that he *must* do so.

It's difficult to see what purpose appointing a next friend even serves in this context. Where a petitioner tries to waive his claims, as in *Whitmore,* the next friend has an obvious role to fill: The prisoner's incompetence renders him unable to make decisions in his own best interests. Here, the issue is not competence to make decisions, but competence to assist counsel.

The prisoner's incompetence is relevant, not because it impairs his decisionmaking, but because it prevents him from communicating information that he alone possesses. Appointing a next friend does not respond to this dimension of incompetence—particularly where, as here, the next friend is an attorney with no greater knowledge of Gates's circumstances than his counsel. No matter how faithfully Rohan may act in Gates's best interests, she cannot get inside his head any more than his counsel can.

6. Finally, our holding accords with several state decisions interpreting analogous state collateral review provisions. *See Carter v. State,* 706 So.2d 873, 876 (Fla.1998); *State v. Debra A.E.,* 188 Wis.2d 111, 523 N.W.2d 727, 735–36 (1994); *People v. Owens,* 139 Ill.2d 351, 151 Ill.Dec. 522, 564 N.E.2d 1184, 1190 (1990). Federal collateral review concededly presents issues of comity that state review does not. Nonetheless, the state decisions are instructive. They rely on principles of meaningful assistance of counsel that apply with equal force to the federal statutory right in 21 U.S.C. § 848(q)(4)(B). *See Carter,* 706 So.2d at 875; *Debra A.E.,* 523 N.W.2d at 732; *Owens,* 151 Ill.Dec. 522, 564 N.E.2d at 1189–90.

Three other state decisions take a contrary position. *See Commonwealth v. Haag,* 570 Pa. 289, 809 A.2d 271, 280–81 & n. 11, 282–85 (2002); *Ex parte Mines,* 26 S.W.3d 910, 912–16 (Tex.Crim.App.2000); *Fisher v. State,* 845 P.2d 1272, 1275–77 (Okla.Crim.App.1992). We find them either inapplicable or unpersuasive. *Fisher* is inapplicable because of key differences between federal and Oklahoma postconviction review. It relied largely on the premise that an incompetent petitioner could file a successive petition upon regaining competence. *Fisher,* 845 P.2d at 1277. As noted earlier, this safeguard is inapplicable

at the federal level because of statutory restrictions on successive petitions and the prospect that a prisoner will be executed before he regains competence. *See* p. 812 *supra.* Neither concern arises under Oklahoma law, which has more liberal standards for successive petitions, *see* Okla. Stat., tit. 22, § 1086 (allowing successive applications whenever "the court finds a ground for relief asserted which for sufficient reason was not asserted *or was inadequately raised* in the prior application" (emphasis added)), and a standard for competence to be executed that includes capacity for rational communication, *see Fisher,* 845 P.2d at 1276 n. 3.

*Haag* likewise relied on the prospect of successive petitions to reject a competence requirement, and it cited *Fisher,* among other cases, in support. 809 A.2d at 280–81 & n. 11. But it failed to note that Pennsylvania law differs from Oklahoma law (and resembles federal law) in both relevant respects. *See* 42 Pa. Cons.Stat. § 9543(a)(3) (restrictions on successive petitions); *Commonwealth v. Jermyn,* 539 Pa. 371, 652 A.2d 821, 823–24 (1995) (no rational communication requirement). The court did indicate that successive petitions would not be time-barred, *see Haag,* 809 A.2d at 280 n. 11, but its failure even to acknowledge these other issues diminishes its value as persuasive authority.

*Mines,* on the other hand, made no pretense about the efficacy of successive petitions, and instead rejected the relevance of competence on collateral review altogether. 26 S.W.3d at 911–16. It is the only one of the six decisions to take that extreme position, and we do not find it persuasive. It pointed out that many trial rights that competence underlies—such as the constitutional right to counsel, the presumption of innocence, and the right to be present—do not apply to habeas. *Id.* at 913–14. But merely enumerating the

rights a habeas petitioner does *not* enjoy doesn't address the relevance of competence to those he does.

In short, we find *Fisher* inapposite and *Haag* and *Mines* unpersuasive. We are convinced instead by *Carter, Debra A.E.* and *Owens.* Those decisions support our recognition of a competence requirement.

### III

▮ Having concluded that Gates has a statutory right to competence in his federal habeas proceedings, we now consider whether the district court adequately protected it when it refused to stay those proceedings. District courts have inherent authority to stay proceedings before them, *see Landis v. N. Am. Co.,* 299 U.S. 248, 254, 57 S.Ct. 163, 81 L.Ed. 153 (1936), and statutory authority to stay underlying state proceedings when necessary to determine federal habeas claims, *see McFarland,* 512 U.S. at 857–58, 114 S.Ct. 2568. We review their decisions to grant or deny stays for abuse of discretion. *Id.* at 858, 114 S.Ct. 2568. That discretion, however, must be exercised within constitutional and statutory limits.

▮ The district court acknowledged that a competent petitioner may sometimes "provide information that might strengthen some of the claims in the petition or give rise to other claims," but held that Gates's counsel had identified only "fairly general" areas where he might be able to assist. The district court's characterization of the contents of the sealed brief is debatable, but we do not agree in any event that the standard it applied sufficiently protected Gates's rights. Requiring counsel to identify with particularity what petitioner would tell them were he competent, rather than merely the general areas where he could potentially assist, sets an unrealistically high bar under the circumstances.

Perhaps there are cases where an incompetent petitioner's counsel knows exactly what he needs to know but can't find out. Surely, however, those are the exception rather than the rule. Requiring an incompetent petitioner's counsel to identify precisely what the petitioner would tell him were he able seems more likely to elicit the response, "Well, if I knew that, I wouldn't have to ask!"

If a court holds an entire trial while a defendant is incompetent, we don't review for harmless error by speculating what the defendant might have said had he been able. The error is structural; it "contaminate[s] ... the entire ... proceeding" and "any inquiry into its effect on the outcome of the case would be purely speculative." *Satterwhite v. Texas,* 486 U.S. 249, 256–57, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988); *see United States v. Klat,* 156 F.3d 1258, 1264 (D.C.Cir.1998); *cf. Holloway v. Arkansas,* 435 U.S. 475, 489–90, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978) (complete constructive denial of counsel). Conducting an entire habeas proceeding while a petitioner is incompetent is no different. If this error would be structural and thus fatal even if the government could prove absence of prejudice post hoc, it follows a fortiori that the *petitioner* need not prove prejudice ex ante. That, however, is what the district court required.

At least some of the claims in Gates's petition could potentially benefit from his assistance. His principal contention, for example, is that he was incompetent to stand trial and that his trial counsel were constitutionally ineffective for failing to pursue a competency hearing. Like most ineffective assistance claims, this one depends in large measure on facts outside the record. *See Massaro v. United States,* — U.S. —, 123 S.Ct. 1690, 1694, 155 L.Ed.2d 714 (2003). To prevail, Rohan

would likely have to show Gates was incompetent at trial. If Gates were competent today, he could provide information to bolster that claim. His own testimony about his former state of incompetence, for example, would (to the extent credited by the court) support his position. He could also direct counsel to circumstantial evidence of his incompetence at the time.

Gates's private knowledge could also be relevant to his trial counsel's deficiency in failing to pursue a competency hearing. Whether trial counsel were constitutionally ineffective may depend on their interactions with Gates. The more obvious his incompetence at the time, the more likely that they were deficient for failing to recognize it. Unless Gates can offer his side of the story, we can rely only on trial counsel's version of events.[10]

To take another example, Gates alleges that his trial counsel presented inadequate mitigating evidence during the penalty phase. Once again, if Gates were competent, he could support this claim. He is better positioned than anyone to identify aspects of his personal history that should have been, but were not, elicited. And, again, he is in a unique position to testify about the extent of his trial counsel's efforts to elicit that mitigating evidence from him.

■ We can only speculate what evidence Gates might offer. But that doesn't detract from the probability that *some* corroborating evidence within his private knowledge exists. By forcing Gates to proceed notwithstanding his incompetence, the trial court would effectively prevent him from ever presenting that evidence to a federal tribunal. That prospect is difficult indeed to square with "the humanity of the English law" and its

___

10. Moreover, one of Gates's trial counsel has since died.

recognition that, "had the prisoner been of sound memory, he might have alleged something in stay of judgment or execution." 4 Blackstone at *24–25. And it is impossible to reconcile with a congressional guarantee that "contemplates effective communication between lawyer and client." *Kelly V*, 163 F.3d at 541. Accordingly, we hold that, where an incompetent capital habeas petitioner raises claims that could potentially benefit from his ability to communicate rationally, refusing to stay proceedings pending restoration of competence denies him his statutory right to assistance of counsel, whether or not counsel can identify with precision the information sought.

The State notes that the district court's determination of competence is now nearly a decade old, and asks that we remand for a new competency determination. We leave this to the district court's discretion. If the court agrees, the relevant question will be whether Gates now has the capacity to understand his position and to communicate rationally with counsel. It goes without saying that the mere fact that Gates does not communicate rationally does not mean he is *incapable* of doing so.[11]

Further proceedings in this case must be stayed until Gates is competent.

**REVERSED and REMANDED.**

---

11. Rohan does not seek to proceed with some claims while staying others, so we need not address the appropriate procedure in such situations. Although some state decisions have held that purely record-based or nonfactual claims should proceed notwithstanding the petitioner's incompetence, *see Carter*, 706 So.2d at 876; *Debra A.E.*, 523 N.W.2d at 735, we see little point in *compelling* Rohan to pursue them. The State's interests are prejudiced as much by a stay of all claims as by a stay of some, as the execution cannot proceed until all claims are resolved.

Because of the posture of the case, we leave several important issues open. We do not address what showing a petitioner must make to warrant a competency determination, what weight to attach to a prior state competency determination (e.g., at trial), or whether a petitioner must first "exhaust" by arguing incompetence to pursue state collateral relief in the state courts. Furthermore, while we hold that competence to pursue habeas relief encompasses some rational communication requirement, we need not decide whether the standard is the same as the standard for competence to stand trial. *Cf. Owens*, 151 Ill.Dec. 522, 564 N.E.2d at 1189–90. Finally, we do not authorize competent prisoners to delay their executions indefinitely by filing successive habeas petitions and then challenging their competence to pursue those very petitions. This case involves a first federal habeas petition—what Congress intended to be the primary vehicle for vindicating federal rights—and we limit our holding accordingly.