FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

TEOFILO MEDINA, JR.,
*Petitioner-Appellant*,

v.

KEVIN CHAPPELL, Warden,
*Respondent-Appellee*.

No. 09-99015

D.C. No.
2:94-CV-01892-
RSWL

TEOFILO MEDINA, JR.,
*Petitioner-Appellant*,

v.

R. K. WONG,
*Respondent-Appellee*.

No. 09-99016

D.C. No.
2:97-CV-07062-
RSWL

OPINION

Appeal from the United States District Court
for the Central District of California
Ronald S.W. Lew, Senior District Judge, Presiding

Argued and Submitted
March 19, 2014—San Francisco, California

Filed March 26, 2015

Before: Sidney R. Thomas, Chief Judge, and Kim McLane
Wardlaw, and Marsha S. Berzon, Circuit Judges.

Opinion by Judge Wardlaw

**SUMMARY**[*]

**Habeas Corpus / Death Penalty**

The panel affirmed the district court's denial of Teofilo
Medina, Jr.'s habeas corpus petitions challenging his murder
convictions and two death sentences, one of which was
imposed in Orange County, the other in Riverside County.

Affirming the district court's denial of the petition arising
out of the Orange County case, the panel rejected Medina's
contention that trial counsel's performance was deficient in
his investigation and presentation of mitigation evidence
relating to Medina's childhood, and held that Medina did not
establish prejudice. The panel rejected Medina's contention
that he is entitled to habeas relief because trial counsel
provided ineffective assistance at the penalty phase by failing
to obtain and present relevant mitigation evidence of
Medina's possible mental and emotional impairments. The
panel held that counsel performed deficiently by failing to
object, during cross-examination of a doctor during the sanity
phase, to the prosecutor's use of a study to remind the jury
that people are capable of faking schizophrenia and fooling
mental health workers. But the panel held that the failure to

[*] This summary constitutes no part of the opinion of the court. It has
been prepared by court staff for the convenience of the reader.

object was not prejudicial during the penalty phase, and that counsel's performance was not deficient with respect to the doctor's testimony at the sanity phase.

The panel explained that the Supreme Court's holding in *Ryan v. Gonzales*, 133 S. Ct. 696 (2013), that 18 U.S.C. § 3599(a)(2) does not provide a statutory right to competency in federal habeas proceedings, is not limited to post-AEDPA cases, but that the portion of the *Gonzales* opinion constraining the discretion of district courts to issue stays is inapplicable to pre-AEDPA petitions such as the Orange County petition. The panel concluded that the district court nonetheless acted within its discretion in denying Medina's request for a stay of his habeas proceedings due to his incompetency.

Affirming the district court's denial of the petition arising out of the Riverside County case, the panel rejected Medina's contention that counsel's failure to investigate Medina's psychiatric history during the competency phase of the trial, and his resulting failure to provide this information to the experts who evaluated Medina's competency, constituted ineffective assistance. Assuming without deciding that counsel performed deficiently by failing to investigate and present mitigation evidence at the penalty phase, and by failing to investigate a potential insanity defense, the panel denied relief because fairminded jurists could disagree as to whether any such deficient performance prejudiced Medina.

## COUNSEL

Robert B. Amidon (argued), Tarzana, California, and Wayne C. Tobin (argued), Newbury Park, California; David L. Bernstein, Studio City, California, for Petitioner-Appellant.

Holly D. Wilkens (argued), Supervising Deputy Attorney General; Gary W. Schons, Senior Assistant Attorney General; and Adrianne S. Denault, Deputy Attorney General, Office of the California Attorney General, San Diego, California; Kamala D. Harris, Attorney General of California; Dane R. Gillette, Chief Assistant Attorney General; Office of the California Attorney General, San Francisco, California, for Respondent-Appellee.

Jon M. Sands, Federal Public Defender; Therese Day, Assistant Federal Public Defender, Phoenix, Arizona; Sean K. Kennedy, Federal Public Defender; Mark R. Drozdowski and C. Pamela Gómez, Deputy Federal Public Defenders, Los Angeles, California, for Amici Curiae the California Appellate Project, the Federal Public Defenders of the District of Arizona, Central District of California, Eastern District of California, District of Nevada, and the Federal Defender Services of Idaho.

**OPINION**

WARDLAW, Circuit Judge:

Teofilo Medina, Jr., a California death row inmate, appeals the district court's denial of his petitions for a writ of habeas corpus. Medina killed four people in a month-long crime spree in 1984. For these murders, the California courts imposed two death sentences: one in Orange County, the subject of the habeas petition in No. 09-99015, and one in Riverside County, the subject of the petition in No. 09-99016. The Orange County proceedings became final first. Medina filed his federal habeas petition in the Orange County case before the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Medina's Riverside County petition was filed after the effective date and is therefore subject to AEDPA review.[1]

The petitions allege ineffective assistance of counsel at various phases of each trial, with a focus on claims of deficient performance at the penalty phases. We have jurisdiction under 28 U.S.C. §§ 1291 and 2253. Because counsel in the Orange County trial did not render deficient performance, and because the California Supreme Court could have reasonably concluded that any deficient performance in the Riverside County trial failed to prejudice Medina, we affirm the district court's orders denying Medina's habeas petitions. In addition, we conclude that the district court did not abuse its discretion by denying a stay to determine Medina's competency while the Orange County petition was pending.

---

[1] Contemporaneous with this decision, we file an order consolidating these appeals for purposes of disposition.

## I.  FACTUAL BACKGROUND

The factual circumstances of Medina's crimes are undisputed.  Shortly after his August 1984 release from prison in Arizona, Medina returned to California.  From October 13 through November 7, 1984, Medina engaged in a crime spree in Orange County, which included stealing a gun and holding up a drive-in dairy and two gas stations.  At the location of each robbery, he shot and killed an employee of the business from which he stole.  *People v. Medina ("Medina I")*, 799 P.2d 1282, 1287 (Cal. 1990).  During this same period, he committed a fourth robbery-homicide, this time at a gas station in Riverside County.  *People v. Medina ("Medina II")*, 906 P.2d 2, 16 (Cal. 1995).

Medina was apprehended on November 7, 1984 after he attempted another robbery.  During the course of that robbery, he shot at, but missed, two civilian witnesses.  The witnesses gave police Medina's license plate number, and officers apprehended Medina at his sister's home.  The evidence linking Medina to the crimes included the gun used in each of the crimes and his fingerprint on a bottle at the scene of one crime.  Medina's sister found the gun in Medina's shaving kit.  Bullets recovered from the murder victims matched the gun.

Medina's history of abuse as a child is relevant to his habeas claims.  Declarations from family members describe Medina's troubled and troubling past.  These declarations, obtained by habeas counsel, provide the details of the physical abuse Medina suffered growing up, details that were not obtained by trial counsel in either case.  Medina was whipped by nuns while attending Catholic school, hit with a belt by his father to the point where the belt left marks, and

hit by his mother with a tree switch, a belt, or her hand. In addition to his own physical abuse, Medina's father was an alcoholic who sometimes hit Medina's mother, and on one occasion chased her around the house with a knife.

Medina also suffered from numerous accidental injuries as a child. When Medina was born, the physician had to use forceps to facilitate the delivery, which left Medina with two black eyes and bruises on his head. Excessive anesthetization of Medina's mother may have exacerbated this trauma. At age 5 or 6, Medina fell and hit his head on a concrete floor, leaving a scar on his forehead. When he was 6 or 7 years old, he let his cousins use his head for target practice with BB rifles. One summer when the family was in Utah, Medina "fell into a river or a canal and almost drowned." As a boy, Medina spent hours assembling model airplanes in his room. When family members complained about glue fumes, Medina stuffed towels under his door to confine the fumes to his room. Finally, at age 14, Medina was hit by a car while riding a bicycle. His leg was badly broken, and several family members noticed that he became more violent afterwards. None of this information was uncovered by his trial attorneys.

Habeas counsel also discovered that Medina has a documented history of mental illness. During Medina's previous periods of incarceration in California and Arizona, Medina was diagnosed at least eleven times as suffering from paranoid schizophrenia or related conditions. From a young age, Medina talked to himself and would clench and unclench his fists when upset. He also pulled out all of his eyelashes when he was 11 or 12 years old. As an adult, Medina frequently made delusional references to being under surveillance, spied upon, and persecuted by neighbors and

fellow inmates. Of the nineteen members of Medina's extended family, as many as four suffered from schizophrenia, and others may have had different mental illnesses.

## II. THE ORANGE COUNTY PETITION

### A. Procedural Background and Standard of Review

Prior to his jury trial in Orange County, Medina moved for a competency hearing, at which lay witnesses, various psychiatrists, psychologists, and other experts testified about his violent behavior, attempted suicide, possible schizophrenia, and inability to cooperate with counsel. *Medina I*, 799 P.2d at 1288. The testimony of the five psychological and psychiatric experts was contradictory: some doctors concluded that Medina was competent to stand trial and others opined that he was not. *Id.* The mental health professionals also provided markedly different diagnoses—some found him schizophrenic, while others doubted that diagnosis or concluded that Medina was malingering. Following the competency hearing, the jury concluded that Medina was competent to stand trial. *Id.*

At trial, Medina asserted an insanity defense. During the sanity phase, various mental health professionals again testified, to much the same effect. *Id.* Medina and a number of lay witnesses also testified about Medina's background, "including his prior offenses and convictions, prison terms, drug use, violent and aberrant behavior, attempted suicide, confinement in a state mental hospital, and attempted escape therefrom." *Id.* The jury found Medina legally sane at the time of the charged offenses. *Id.*

After the jury returned a guilty verdict, the penalty phase commenced. Defense counsel called four mental health experts who had previously testified. Their testimony was consistent with testimony adduced at the sanity and competency phases. *Id.* at 881. Medina's father testified that Medina sniffed glue as a child, that Medina's brother, John, committed suicide, that Medina had been hit by a car while delivering newspapers, and that Medina's behavior had been strange when he was driving back to California after his release from prison in Arizona.

On December 3, 1986, after deliberating for seven and a half hours, the jury concluded that the appropriate penalty was death. On February 26, 1987, Medina was sentenced to death.

The California Supreme Court affirmed Medina's convictions and death sentence on direct appeal. *Medina I*, 799 P.2d at 1310. The United States Supreme Court granted certiorari to determine the constitutionality of California Penal Code § 1369(f), which placed the burden on the defendant to show by a preponderance of the evidence his competence to stand trial. *See Medina v. California*, 505 U.S. 437 (1992). The Court upheld the statute and affirmed the California Supreme Court's decision. *Id*. at 452–53.

Medina filed his habeas petition in federal court on October 2, 1995, and, after returning to state court to exhaust several claims, he filed an amended petition on November 19, 1997. The district court granted an evidentiary hearing on several claims, and received evidence including declarations, deposition transcripts, and exhibits.

On June 5, 2003, Medina filed a state court petition arguing that he was mentally retarded and as such, under *Atkins v. Virginia*, 536 U.S. 304 (2002), could not be executed. The California Supreme Court denied the petition, and the district court granted Medina's motion to amend his federal habeas petition to include his *Atkins* claim. On June 16, 2008, the district court denied federal habeas relief on all claims presented in Medina's petition. On January 23, 2009, the district court entered final judgment.

Because Medina filed his federal habeas petition in the Orange County case before the effective date of AEDPA, its substantive provisions do not apply. *See Phillips v. Ornoski*, 673 F.3d 1168, 1178–79 (9th Cir. 2012). "We therefore review *de novo* questions of law or mixed questions of law and fact decided by the district court or by the state courts." *Id.* at 1179. "We review the district court's factual findings for clear error, and accord state court factual findings a presumption of correctness." *Id.*

We review counsel's conduct in a capital sentencing proceeding under the same standards used for judging ineffective assistance at trial. *Strickland v. Washington*, 466 U.S. 668, 686–87 (1984). To prevail, Medina must first show that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. In making this determination, we "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689 (internal quotation marks omitted). Second, Medina "must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as

to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

## B. Failure to Investigate and Present Mitigating Evidence

Medina argues that his trial counsel in the Orange County case rendered ineffective assistance by failing to properly investigate Medina's childhood. According to Medina, such a failure meant that his counsel lacked information that could have been used in mitigation during the penalty phase. Because counsel lacked sufficient knowledge, argues Medina, he could not have made a reasoned tactical decision about what to present at the penalty phase. We disagree, and conclude that counsel's performance was not deficient.

Counsel has a duty to investigate, but this duty is not without limits. *Strickland* clarified that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." 466 U.S. at 691. We "conduct an objective review of [counsel's] performance, measured for reasonableness under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time." *Wiggins v. Smith*, 539 U.S. 510, 523 (2003) (citations omitted) (internal quotation marks omitted).

As the district court correctly concluded, Medina's defense team conducted a thorough investigation of his childhood and family background—actions that stand in

sharp contrast to the conduct of defense counsel in cases relied upon by Medina in support of his ineffective assistance argument. In *Ainsworth v. Woodford*, 268 F.3d 868 (9th Cir. 2001), for example, trial counsel's "preparation" for the penalty phase proceedings consisted of interviewing one defense witness for ten minutes on the morning she was to testify, and failing to examine Ainsworth's employment, medical, prison, probation, or military records, all of which were readily available. *Id.* at 874. In *Silva v. Woodford*, 279 F.3d 825 (9th Cir. 2002), we concluded that counsel's complete abandonment of *all* investigation into Silva's background was not objectively reasonable when Silva instructed counsel simply that he did not want his parents used as witnesses and that he preferred they be left alone. *Id.* at 838. In *Libberton v. Ryan*, 583 F.3d 1147 (9th Cir. 2009), we found ineffective assistance at the penalty phase where defense counsel failed to interview any witnesses for trial and only a very few for sentencing. *Id.* at 1169.

In the Orange County case, the district court credited counsel's declaration that his investigator interviewed family members and briefed him regarding the interviews, and that counsel had questioned the family members himself. In crediting counsel's declarations, the district court relied upon billing records and trial documents showing the amount of time investigators spent speaking with witnesses and conferring with counsel. Given the supporting evidence, the district court did not clearly err by crediting counsel's declaration.

Nor does counsel's failure to uncover Medina's childhood abuse render his performance deficient. The district court credited counsel's sworn statement that neither Medina nor his family members divulged to counsel the abuse to which

he was subjected, and Medina does not directly challenge this finding. As Medina argues, "counsel has a duty to investigate, even if his or her client does not divulge relevant information." *Vega v. Ryan*, 757 F.3d 960, 969 (9th Cir. 2014). Our decision in *Vega* does not, however, impose upon counsel a duty to conduct a perfect investigation that reaches every recess of a client's mind. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effect of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. Unlike the situation in *Vega*, Medina's counsel conducted an adequate investigation of his client's history. The evidence counsel sought and reviewed suggested that Medina experienced an average childhood. Prison records, Medina's own testimony under oath, and discussions with Medina's family members,[2] all indicated that Medina's childhood was relatively unremarkable.

Medina nonetheless asserts that counsel's investigation was unreasonable because he failed to ask the "right questions." Medina's sisters claim that no one ever explained to them what sort of evidence could be considered in mitigation. Medina's trial counsel, however, reported that he supervised the investigators who questioned Medina's family and ensured that the family was informed of the defense team's needs. Counsel's assessment is corroborated by billing records, credited by the district court, that showed the

---

[2] Trial counsel's billing records further reflect a six-hour period in which he spoke with Medina's sister early in the case on February 9, 1985. During that six-hour time-frame, counsel discussed several matters including the "bizarre behavior of Medina during the time period [in] which these incidents took place."

amount of time the defense team spent with Medina's family and the quantity of evidence the team gathered. "[A]pplying a heavy measure of deference to counsel's judgments," *id.* at 691, we cannot conclude that counsel's performance was deficient.

Medina also relies on a letter to counsel, dated September 4, 1985, from Dr. Klatte, a psychiatrist who evaluated Medina's mental health prior to trial, to argue that counsel possessed information that "would lead a reasonable attorney to investigate further" into Medina's childhood. *Wiggins*, 539 U.S. at 527. But, this letter's "tantalizing indication" that not all was as it seemed consists of two inapposite passages. The first mentions that Medina loved his father, but also feared him when he would get drunk and chase the kids out of the house.[3] The second recounts a bizarre memory Medina has of his mother, but it is a memory completely devoid of any indication of abuse.[4]

---

[3] "[Medina] recalls as a child feeling his father was a superman. He loved him but feared him when he would get drunk and chase the kids out of the house."

[4] "[Medina] describes a very complex and pathological relationship with his mother. On the one hand he indicates he was very close to her and she was a very loving maternal woman. On the other hand his most vivid memory from childhood still haunts and upsets him, bringing tears to his eyes as he recounts it. He was about 7 to 9 years of age, he went to his mother's bedroom and saw her lying on her bed. They looked at each other and 'she looked like a smiling conniving harlot as described in the old testament.' She then said 'I prayed to the Virgin Mary for a homosexual.' Suddenly he started crying and got angry, screaming at his mother 'I'm going to go straight to hell for that.' He then ran out of the room. He now does not know what he meant by what he said."

By contrast, in *Wiggins*, ample evidence in records available to counsel indicated that further investigation would very likely have unearthed mitigating evidence. The Department of Social Services' records and the pre-sentence report demonstrated that Wiggins's mother was an alcoholic who left him and his siblings alone for days without food on at least one occasion, and that Wiggins went from foster home to foster home where he displayed emotional difficulties and had frequent long absences from school. 539 U.S. at 525. The Court concluded that counsel unreasonably ceased its investigation and failed to pursue mitigating evidence.

Here, counsel interviewed Medina's family members but found no evidence of physical abuse. The investigation was adequate and thorough. Counsel's decision not to interview additional family members was also reasonable. In *Bobby v. Van Hook*, 558 U.S. 4 (2009) (per curiam), the Supreme Court reversed a grant of habeas relief based on an ineffective assistance claim at the penalty phase in a pre-AEDPA case, holding that counsel had reached that point at which "evidence from more distant relatives can reasonably be expected to be only cumulative, and the search for it distractive from more important duties." *Id.* at 11. So too here. The vague allusions to dysfunctional familial relationships related in Dr. Klatte's letter did not alert counsel that he should conduct more interviews and further investigation, particularly when Medina himself reported an unremarkable childhood.

In addition, while not foundational to our analysis, it is nevertheless significant that counsel originally intended to call more family members at the penalty phase, but Medina refused to allow counsel to call any family members other

than his father. While a defendant's refusal to allow a witness to testify does not excuse counsel from interviewing that witness as part of a reasonable investigation into possible mitigating evidence, *Stankewitz v. Wong*, 698 F.3d 1163, 1170 (9th Cir. 2012) (noting that "supposed opposition to mitigating evidence" does not end the inquiry into the adequacy of counsel's performance), here counsel did thoroughly interview other family members despite Medina's refusal to allow them to testify.

Nor has Medina established prejudice, i.e., "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. To evaluate whether Medina was prejudiced by counsel's failure to investigate, if any, we "reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, 539 U.S. at 534.

In mitigation, Medina's father testified that Medina was hit by a car while riding a bicycle as a child and was exposed to glue fumes when he built model airplanes, and about an incident in which Medina pulled out all of his eyelashes. He also testified that Medina had been close to his now-deceased mother, that Medina's brother had used drugs heavily after his divorce and was in and out of mental hospitals before finally committing suicide, and that Medina behaved strangely upon his release from prison in Arizona. Medina offered testimony from Richard Negrete, his parole officer, and from James Hicks, an employee of the Orange County District Attorney's office, who had prosecuted a defendant for stabbing Medina approximately twenty-eight times.

Medina also presented the testimony of several mental health experts. Dr. Pierce testified that Medina did poorly on

cognitive tests, that he was not malingering, and that although sane, he suffered from a mental impairment.  Dr. Sharma testified that Medina was suffering from symptoms indicating mental problems, and he noted four possibilities: schizophrenia, "organic brain disorder due to the use and abuse of mind-altering drugs he had used in the past, including, for example, cocaine and PCP," epilepsy caused by a short circuiting of the brain tissue, or antisocial personality disorder.  He further testified that he saw mitigation in Medina's mental problems.  Dr. Sakurai testified that Medina had been placed in the rubber rooms in the Orange County jail several times, that Dr. Sakurai had met with Medina on thirty to forty occasions, and that he had prescribed Medina medication.  Finally, Dr. Klatte testified that Medina was a disturbed person with a diagnosis of schizotypal personality disorder and antisocial personality disorder, and noted that Medina "had a brother who suicided and had a well-established diagnosis of paranoid schizophrenia."

Declarations from Medina's family members obtained by habeas counsel describe additional mitigating evidence that could have been, but was not, presented to the jury during the penalty phase of the Orange County trial.  As detailed in Part I, these declarations from family members describe physical abuse that Medina suffered growing up.  This potentially mitigating evidence, while substantial, was not overwhelming.  The abuse Medina suffered as a child falls short of the horrific violence and deprivation that courts have recognized as convincing mitigation evidence.  *Compare Wiggins*, 539 U.S. at 535–36 (holding that counsel's failure to investigate and present evidence of petitioner's "physical torment, sexual molestation, and repeated rape" established prejudice), *with Samayoa v. Ayers*, 649 F.3d 919, 929 (9th Cir. 2011) (observing that petitioner's evidence of "harsh

discipline, poverty, drug abuse, and violence and sexual abuse among extended family members" was "not so dramatic or unusual" that it would have affected the death penalty verdict).  Moreover, unlike in *Stankewitz v. Woodford*, where we found prejudice based on counsel's failure to present evidence that the defendant "suffered from organic brain damage, to the point of being borderline mentally retarded," 365 F.3d 706, 723 (9th Cir. 2004), there was no strong evidence that Medina suffered permanent brain damage as a result of his childhood head injuries.

For its part, the prosecution presented a litany of aggravating factors at the penalty phase.  The prosecution relied on Medina's prior convictions for rape, assault, kidnapping, burglary, and discharging a firearm into an occupied building, as well as Medina's repeated attacks on other inmates and prison staff while incarcerated.  The prosecution also elicited testimony from the victims' relatives about the victims' non-violent nature.

The mitigating evidence that was presented failed to persuade the jury in light of this strong aggravating evidence.  And the potential mitigating evidence was weaker than the array of mitigating evidence actually presented.  Reweighing the aggravating evidence against all mitigating evidence, *Wiggins*, 539 U.S. at 534, we conclude that comparatively weak additional mitigating evidence would not likely have altered the jury's verdict.  Accordingly, Medina was not prejudiced within the meaning of *Strickland*.  466 U.S. at 694–96.

## C.  Evidence of Mental and Emotional Impairments

Medina alternatively claims that he is entitled to habeas relief because trial counsel provided ineffective assistance at the penalty phase by failing to obtain and present relevant mitigating evidence of Medina's possible mental and emotional impairments.  Specifically, Medina argues that counsel rendered ineffective assistance by: failing to obtain medical records reflecting the hospitalization of Medina's brother and maternal aunt, which showed that both were hospitalized with diagnosed schizophrenia; failing to provide EEG and CT scan results to an expert who requested them; and failing to retain an expert to explain to the jury the possible mitigating effect of Medina's exposure to neurotoxins in glue when he was young.

At the penalty phase, counsel has "a professional responsibility to investigate and bring to the attention of mental health experts who are examining his client, facts that the experts do not request."  *Wallace v. Stewart*, 184 F.3d 1112, 1116 (9th Cir. 1999).  "Regardless of whether a defense expert requests specific information relevant to a defendant's background, it is defense counsel's duty to seek out such evidence and bring it to the attention of the experts."  *Hovey v. Ayers*, 458 F.3d 892, 925 (9th Cir. 2006) (internal quotation marks omitted).

Medina argues that counsel's failure to obtain his brother's and aunt's medical records and subsequent failure to turn them over to the experts who testified during the penalty phase constituted ineffective assistance of counsel.  Medina asserts that had counsel obtained and relayed this information, it could have strengthened his claim that he, too, was schizophrenic.  His argument is unpersuasive.

First, trial counsel did obtain information about Medina's brother's diagnosis of paranoid schizophrenia. During the penalty phase, Dr. Klatte testified that Medina's brother "had a well-established diagnosis of paranoid schizophrenia." Although Dr. Sharma testified in a deposition that he was never given information about Medina's brother's mental illness as a "confirmed diagnosis," he was made aware of the mental illness and he "had assumed or inferred from what [he] was told at that time that more likely than not the diagnosis would have been schizophrenic disorder for his brother." The "failure" to provide Dr. Sharma with the confirmed diagnosis, even if it constitutes deficient performance, certainly does not meet *Strickland*'s prejudice requirement, given that Dr. Sharma assumed the diagnosis.

Second, Medina is correct that his aunt's diagnosis of paranoid schizophrenia was never provided to Dr. Sharma, but counsel's failure to provide this information was not deficient performance. The district court credited counsel's account that he was unaware of the aunt's mental problems at the time of the penalty phase because neither Medina nor any family member had disclosed the problems. Counsel cannot be faulted for not having information about a second degree relative's hospital records when his investigation was reasonable and none of Medina's family members with whom he spoke alluded to the aunt's mental health problems. *See Babbitt v. Calderon*, 151 F.3d 1170, 1174 (9th Cir. 1998) (holding that counsel's failure to discover an alleged family history of mental illness was not unreasonable where counsel spoke with family members and friends who would have such information but none of them indicated there was any history of mental illness).

Medina argues that counsel's failure to provide Dr. Sharma with Medina's EEG and CT scan results despite Dr. Sharma's requests for them constituted ineffective assistance of counsel. Trial counsel should have provided the test results to Dr. Sharma, but his failure to do so did not prejudice Medina under the second prong of *Strickland*. Dr. Sharma had been made aware that "Mr. Medina had undergone a CAT scan, an EEG, brain x-rays, and a neurological examination yielding results within the normal limits." Dr. Sharma further stated that he had been relying upon a "broken brain" theory during the penalty phase of Medina's trial, and he conceded that if he had been shown the test results, which were within the normal range, the results would have the potential to contradict the "broken brain" defense. It is thus unclear how Medina would have benefitted at the penalty phase had Dr. Sharma obtained the test results; if anything, Dr. Sharma's testimony would have been less helpful to Medina had the results been provided.

Finally, Medina argues that counsel performed deficiently by failing to request a neurological examination to assess possible brain damage resulting from years of substance abuse. Counsel was aware of Medina's use of drugs and history of glue sniffing. The district court credited counsel's account that he passed on information regarding Medina's glue sniffing to the doctors. Moreover, counsel intended to follow up on the issue with an expert who would do more testing, but Medina refused to see any more experts. As counsel must respect a defendant's wishes about whether to undergo additional psychological testing, a failure to conduct additional testing is not deficient performance on the part of counsel in such circumstances. *Gerlaugh v. Stewart*, 129 F.3d 1027, 1034–35 (9th Cir. 1997). And even if Medina were now to present neurological test results bringing some

new mental deficiency to light, evidence produced after the fact is not necessarily relevant to whether counsel's actions were reasonable at the time. *See Sims v. Brown*, 425 F.3d 560, 584 (9th Cir. 2005), *amended by* 430 F.3d 1220 (denying habeas relief because "[Petitioner's] argument turns on a latter-day battle of experts; however, the question is whether *counsel* did all that he was constitutionally required to do at the time"). Counsel's investigation into Medina's brain damage was not deficient.

### D.  Error With Respect to Dr. Gold's Testimony

Medina points to two mistakes made by counsel at the sanity phase involving Dr. Gold's testimony: counsel's failure to object to cross-examination of Dr. Gold based on the Rosenhan study,[5] and counsel's failure to adequately prepare Dr. Gold to testify at the sanity hearing. Medina contends that these deficiencies further prejudiced him at the penalty phase, rendering his death sentence unreliable. We have recognized that "prejudice may result from the cumulative impact of multiple deficiencies." *Harris ex rel. Ramseyer v. Wood*, 64 F.3d 1432, 1438 (9th Cir. 1995) (internal quotation marks omitted).

Trial counsel's failure to object to the use of the Rosenhan study during the prosecutor's cross-examination of Dr. Gold was deficient performance. The prosecution's purpose in

---

[5] In the Rosenhan study, eight individuals who were not suffering from any mental illness visited a mental institution and complained they were hearing voices. D. L. Rosenhan, *On Being Sane in Insane Places*, 13 Santa Clara Law. 379 (1973). All of them were admitted and diagnosed as schizophrenic or manic-depressive despite their lack of mental illness. *Id.* at 384.

mentioning this study was to remind the jury that people are capable of faking schizophrenia and fooling mental health workers into rendering that diagnosis.

California Evidence Code section 721(b)(1) prohibits cross-examination of expert witnesses regarding scientific journal articles unless the expert considered or relied upon that article in forming his opinion. California courts have also held that the prosecutor's reference to the Rosenhan study during cross-examination, specifically, is improper. *People v. Visciotti*, 825 P.2d 388, 435 (Cal. 1992).

Counsel's failure to object, however, did not prejudice Medina during the penalty phase within the meaning of *Strickland*. The prosecutor's reference to the study was only a small piece of the evidence admitted at the competency hearing. Additionally, the prospect that Medina was malingering and had fooled mental health experts was suggested by more than the Rosenhan study. On direct examination at the sanity phase, Dr. Gold stated that many prisoners malinger and, in response to a question about whether Medina was malingering, testified: "It's possible, but it's not probable." Thus, the reference to the Rosenhan study was cumulative of other, more direct evidence of possible malingering and, therefore, was not prejudicial.

Medina also contends that counsel's failure to prepare Dr. Gold to testify at the sanity phase of his trial was deficient performance. In his declaration, Dr. Gold asserts that defense counsel failed to provide him with "relevant medical records and reports relating to petitioner," and that counsel spent only about an hour with him prior to the presentation of his testimony. However, counsel is entitled to rely upon the opinion of experts, and, outside of the penalty phase, is not

required to provide experts with relevant information they do not request.  *See Wallace*, 184 F.3d at 1117 (distinguishing between ineffective assistance claims for failure to provide experts with information at the penalty and guilt phases).

In sum, although counsel performed deficiently by failing to object to the Rosenhan study, that error was not prejudicial under *Strickland* during the penalty phase.  And counsel's performance was not deficient with respect to Dr. Gold's testimony at the sanity phase.

### E.  Request for Stay Due to Incompetency

Finally, we affirm the district court's denial of Medina's request for a stay of his habeas proceedings due to his incompetency.  In *Ryan v. Gonzales*, 133 S. Ct. 696 (2013), the Court held that 18 U.S.C. § 3599(a)(2) does not provide a statutory right to competency during federal habeas proceedings, and the Court constrained the discretion of district courts to issue stays when there is no reasonable hope of a petitioner regaining competence in the foreseeable future.  Medina asserts that *Gonzales* has no applicability to his pre-AEDPA petition.  We disagree.

As an initial matter, the Supreme Court's holding that 18 U.S.C. § 3599(a)(2) does not provide a statutory right to competency in federal habeas proceedings is not limited to post-AEDPA cases.  Indeed, *Gonzales* expressly overruled our decision in *Rohan v. Woodford*, 334 F.3d 803 (9th Cir. 2003), a pre-AEDPA case in which we held that "'where an incompetent capital habeas petitioner raises claims that could potentially benefit from his ability to communicate rationally, refusing to stay proceedings pending restoration of competence denies him his statutory right to assistance of

counsel, whether or not counsel can identify with precision the information sought.'" *Gonzales*, 133 S. Ct. at 701 (quoting *Rohan*, 334 F.3d at 819).

The pre-AEDPA/post-AEDPA distinction is relevant, however, as to Part III of *Gonzales*, in which the Court went on to "address only [the] outer limits" "of the district court's discretion to issue stays." *Gonzales*, 133 S. Ct. at 708. This portion of the Court's opinion relies heavily upon Congress's intent in enacting AEDPA and the practical consequences of stays for cases subject to AEDPA. *See id.* at 708–09. Consequently, the Court's conclusion that "[w]here there is no reasonable hope of competence, a stay is inappropriate and merely frustrates the State's attempts to defend its presumptively valid judgment,"**[6]** *id.* at 709, is inapplicable to pre-AEDPA petitions such as this one.

But the inapplicability of this portion of the Court's holding does not aid Medina's case. As the Court noted, defining the outer limits of district courts' authority to *grant* stays does not affect our analysis in those cases, like Medina's, in which the district court has denied a stay. In such a case, to grant relief, "we would have to conclude that the District Court abused its discretion in *denying* the stay." *Id.* at 707 n.13. The district court did not abuse its discretion here.

---

**[6]** Although the Court did not cabin its analysis to AEDPA, it roots its analysis in the congressional purpose in enacting AEDPA. *Gonzales*, 133 S. Ct. at 709 ("Without time limits [on stays], petitioners could frustrate AEDPA's goal of finality by dragging out indefinitely their federal habeas review." (alteration in original) (internal quotation marks omitted)).

Medina claimed that his competent assistance was relevant to his *Marsden*, court shackling, and ineffective assistance of counsel claims. The district court appropriately concluded that the first two claims were record based, and therefore, even under the statutory right to competence framework, no stay was necessary. *See Blair v. Martel*, 645 F.3d 1151, 1156 (9th Cir. 2011). With respect to the ineffective assistance of counsel claims, the district court correctly concluded that Medina failed to specify which of his ineffective assistance of counsel claims required his input. Further, Medina finds himself in the same position as the petitioner in *Blair*. He has not put forth a showing that there was evidence concerning his family background, not already in the record and which he could assist in uncovering if he were competent, that would support his claim that counsel conducted an inadequate investigation at the penalty phase. Thus, although the district court may have acted within its discretion had it issued a stay, it did not abuse its discretion in declining to do so.

## III. THE RIVERSIDE PETITION

### A. Procedural Background and Standard of Review

In 1987, following the conclusion of Medina's Orange County trial, the Riverside County District Attorney charged Medina with special circumstances murder, robbery, and burglary arising from the Riverside County homicide. The trial court impaneled a jury to decide whether Medina was competent to stand trial. *Medina II*, 906 P.2d at 17. After hearing testimony from four experts, the jury found that Medina was competent. *Id*. In early 1989, proceedings were temporarily suspended in light of disruptive conduct by Medina, and a second competency determination was

ordered.  *Id.*  After competency experts filed reports, the trial court terminated the competency proceedings and ordered Medina to stand trial with waist chains and leg shackles.  *Id.*

During the guilt phase of the trial, which began on August 14, 1989, Medina attempted to relitigate his competence to stand trial, but otherwise did not present any evidence.  *Id.*  The jury found Medina guilty.  *Id*.  During the penalty phase, Medina's counsel presented testimony from Irene McIntosh, one of Medina's sisters.  *Id.* at 17, 46.  Medina's counsel offered no other mitigating evidence.  The prosecution introduced a range of aggravating evidence, including Medina's Orange County murder convictions as well as convictions for numerous other violent offenses.  *Id.* at 17.  The jury recommended and the trial court imposed a sentence of death.  *Id.* at 16.

The California Supreme Court affirmed Medina's conviction and sentence on direct appeal.  *Id.*  The United States Supreme Court denied his petition for a writ of certiorari.  *Medina v. California*, 519 U.S. 854 (1996).

Medina filed a state petition for habeas corpus, which the California Supreme Court denied "on the merits" in a one-page summary order.  Medina then initiated his federal proceedings by requesting appointment of counsel and a stay of execution.  He filed his federal habeas petition on September 1, 1998, after the effective date of AEDPA.

On April 25, 2000, the district court held an evidentiary hearing on several of Medina's claims.  On June 17, 2008, the court issued a sealed order denying all of Medina's habeas claims.  Roughly seven months later, the court unsealed the order, and granted a limited certificate of appealability.

While Medina's appeal was pending before us, the Supreme Court held in *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011), that federal habeas review under 28 U.S.C. § 2254(d)(1) is "limited to the record that was before the state court that adjudicated the claim on the merits." *Id.* at 1398. We remanded Medina's case so that the district court could reconsider its denial of habeas relief in light of *Pinholster*. On May 3, 2012, the district court reaffirmed its denial of habeas relief.

ADEPA governed the district court's resolution of Medina's Riverside County petition. Under AEDPA, federal courts may not grant a writ of habeas corpus with respect to any claim that was:

> adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Medina's state habeas petition, which the California Supreme Court denied in a one-page summary order, was "adjudicated on the merits" within the meaning of

§ 2254(d). *See Harrington v. Richter*, 562 U.S. 86, 97–100 (2011).[7]

Just as in the Orange County case, all of Medina's certified claims in the Riverside County case allege ineffective assistance of counsel. As discussed at the outset of Part II, *Strickland* requires the petitioner to demonstrate that "counsel's representation fell below an objective standard of reasonableness," 466 U.S. at 688, as well as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id*. at 694. When we view a *Strickland* claim through the lens of AEDPA, "the question is not whether counsel's actions were reasonable," but "whether the state court's application of the *Strickland* standard was unreasonable." *Richter*, 562 U.S. at 105, 101. In the absence of any reasoned state court decision on Medina's ineffective assistance claims, we "must determine what arguments or theories . . . could have supported" the state court's summary denial, and then "ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with" *Strickland* and its progeny. *Richter*, 562 U.S. at 102.

---

[7] Medina argues that applying *Richter* to his petition violates the Eighth Amendment because state procedural rules deprive California death row prisoners of the opportunity to obtain at least one reasoned state decision on the merits of their habeas claims. According to Medina, these rules prevent death row prisoners from filing state habeas petitions in Superior Court, where—if the petition is denied—they are guaranteed at least a "brief statement of the reasons for the denial." Cal. R. Ct. 4.551(g). However, Medina has identified no authority prohibiting death row prisoners from filing their state habeas petitions in Superior Court.

## B. Competency Phase Ineffective Assistance of Counsel Claims

Medina argues that defense counsel's failure to investigate Medina's psychiatric history during the competency phase of the Riverside trial, and his resulting failure to provide this information to the experts who evaluated Medina's competency, constituted ineffective assistance. We disagree.

Medina bore the burden of establishing his incompetence to stand trial. *See Medina*, 505 U.S. at 452–53 (affirming the constitutionality of California's presumption of competence). At Medina's Riverside County competency trial, Drs. Rath, Oshrin, and Sharma testified for the prosecution that Medina was competent to stand trial, and Dr. Kania testified for the defense that he was incompetent. *Medina II*, 906 P.2d at 17. All three prosecution experts testified that they believed Medina was malingering. *Id.*

Dr. Kania has since declared that defense counsel "never met with me or called me to discuss my opinions and conclusions before I testified in the 1988 competency jury trial." He also declared that if he had been given additional information about Medina's medical and social history, his "opinions and conclusions regarding Mr. Medina's severe psychosis would have been greatly strengthened." Dr. Rath stated that defense counsel "never made any written or oral contact with me," and that "it was my custom and practice to contact both the district attorney and defense counsel to seek their input in the preparation of my written evaluation." However, neither Dr. Kania nor Dr. Rath asserted that they actually contacted defense counsel to request information.

That omission is fatal to Medina's claim. Although defense counsel have a general obligation to investigate, *see Strickland*, 466 U.S. at 690–91, the Supreme Court has never held that they have an affirmative duty to provide psychiatric information to experts who will be evaluating their clients for purposes of determining competency to stand trial.

Although Dr. Rath declared that it was his "custom and practice" to request information from defense counsel, he did not state that he actually made such a request. Therefore, the California Supreme Court's determination that Medina's counsel did not perform deficiently during the competency phase because Dr. Rath never made a specific request for information was not contrary to or an unreasonable application of clearly established federal law. 28 U.S.C. § 2254(d)(1).

## C. Failure to Pursue Mitigation Evidence in the Penalty Phase

Medina contends that his Riverside County trial counsel, a different attorney than in the Orange County trial, rendered ineffective assistance by failing to investigate and present meaningful mitigation evidence at the penalty phase. We need not decide whether counsel's performance was deficient, as we hold that any such error was harmless. We therefore turn directly to the question of prejudice and conclude that "fairminded jurists could disagree" as to whether counsel's deficient performance—assuming without deciding that counsel's performance was deficient—prejudiced Medina. *Richter*, 562 U.S. at 102. Accordingly, we affirm the district court's denial of habeas relief.

During the penalty phase, defense counsel presented only one mitigation witness: Medina's sister Irene McIntosh. McIntosh testified that Medina was a "normal, responsible child," but that after he was released from prison, he was "sick in the head" and "not the brother [that she] grew up with."  On cross-examination, McIntosh admitted that she was afraid of Medina and that she feared she could have been his next victim.  She explained that two days before Medina was arrested, he told her he dreamt that he saw her bleeding from scratches on her back.  Although one of Medina's other sisters was present in the courtroom and available to testify, counsel decided not to call her after hearing McIntosh's testimony.

Medina identifies three types of evidence that defense counsel should have investigated and presented in mitigation: his family background, including his history of abuse as a child; his head injuries and possible brain damage; and his psychiatric history.  Habeas counsel obtained the declarations from family members regarding evidence of physical abuse, childhood injuries, and mental illness, none of which was presented at trial.[8]

Nor did counsel call any medical experts, even though several had testified earlier in the penalty phase of Medina's Orange County trial.  Dr. Sharma, who testified during Medina's Riverside County competency hearing, declared that if he had been privy to the information regarding Medina's history of mental illness, he would have been prepared to testify at the penalty phase regarding Medina's "mental impairment and longstanding psychiatric illness."

---

[8] These declarations were before the state habeas court and therefore may be considered on federal habeas under *Pinholster*, 131 S. Ct 1388.

Dr. Gold, who had been Medina's treating psychiatrist in Arizona state prison, also stated that he would have testified as a mitigation witness.[9]   Other psychiatrists who subsequently reviewed Medina's full psychiatric and social history also declared that they would have testified as mitigation witnesses on the basis of that evidence.

To succeed in his ineffective assistance claim, Medina must establish that "there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Pinholster*, 131 S. Ct. at 1408 (quoting *Strickland*, 466 U.S. at 695) (internal quotation marks omitted).   Thus, "we reweigh the evidence in aggravation against the totality of available mitigating evidence," *Wiggins*, 539 U.S. at 534, and then ask whether it would have been unreasonable for the California Supreme Court to conclude based on this evidence that Medina failed to establish prejudice.

As discussed in Part II.B., *supra*, Medina was not prejudiced within the meaning of *Strickland* in the Orange County case by counsel's failure to investigate and discover the abuse Medina suffered as a child.   Unlike in the Orange County case, counsel in the Riverside County case also failed to present evidence of Medina's psychiatric history, which suggested that he suffers from paranoid schizophrenia.   Yet as the Supreme Court recently noted, evidence of mental illness is "by no means clearly mitigating, as the jury might have concluded that [petitioner] was simply beyond

---

[9] Dr. Gold's declaration explicitly mentions his willingness to testify at the Orange County trial, but there is no reason to doubt that he would have been willing to do so at the Riverside County trial as well.

rehabilitation." *Pinholster*, 131 S. Ct. at 1410. Indeed, Medina's Orange County counsel presented much of the same psychiatric evidence during the penalty phase of that trial, yet the jury there voted for the death penalty. Moreover, just as in the Orange County trial, the prosecution presented unusually strong aggravating evidence at the penalty phase, which included multiple murder and rape convictions as well as numerous assaults that Medina committed while in custody.

Reweighing this evidence against all available mitigating evidence, and deferring as we must under AEDPA, we conclude that fairminded jurists could disagree as to whether defense counsel's alleged failure to investigate and present additional mitigating evidence prejudiced Medina. *See Richter*, 562 U.S. at 102 (reiterating that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable"). We therefore affirm the district court's denial of relief on this claim.

### D.  Failure to Present an Insanity Defense

Medina argues that his Riverside County counsel rendered constitutionally ineffective assistance by failing to investigate Medina's mental state at the time of the crimes and consequently failing to present an insanity defense. We have found deficient performance where defense counsel was "on notice about [his client's] mental health and drug abuse problems," yet failed to investigate a potential mental state defense. *Jennings v. Woodford*, 290 F.3d 1006, 1015–16 (9th Cir. 2002) (citing *Seidel v. Merkle*, 146 F.3d 750, 755–57 (9th Cir. 1998)).

At the Riverside County trial, Medina's counsel did not present an insanity defense, and he has since declared that he "never investigated nor pursued in any way an insanity defense." He was, however, aware that in Orange County Medina had a separate trial to determine whether he was not guilty by reason of insanity when he committed the crimes, pursuant to California Penal Code § 1026, which provides for a separate trial on "the question whether the defendant was sane or insane at the time the offense was committed." He was found to be legally sane at the time all the charged crimes were committed.

Assuming without deciding that Medina's counsel performed deficiently by failing to investigate a potential insanity defense, it would not have been unreasonable for the California Supreme Court to conclude that Medina failed to establish prejudice. Medina's Orange County counsel pursued an insanity defense, but it failed, despite Dr. Gold's testimony that Medina was probably insane at the time he committed those murders. While the circumstances of the Riverside County murder and Medina's contemporaneous Orange County crimes might not be *per se* incompatible with an insanity defense, his careful planning and attempts to avoid apprehension would have made an insanity defense difficult. As a result, "fairminded jurists could disagree" as to whether Medina met *Strickland*'s prejudice requirement, *Richter*, 562 U.S. at 102, and the district court correctly denied habeas relief.

**IV.**

For the foregoing reasons, we affirm the district court's denial of Medina's habeas petitions.

**AFFIRMED.**